**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOSEPH BLOOMFIELD,

                              Plaintiff,

- v -                                    Civ. No. 9:08-CV-619
                                                        (GLS/RFT)

BEZALEL WURSENBERGER,[1] MD; JOSE GONZALEZ, MD;
SARA NELSON, M.D.; DONALD SAWYER, Ph.D., *Acting*
*Executive Director*; SHAKUNTHALA MUDIGONDA, *Social*
*Worker*; JEFFREY NOWICKI, *Treatment Team Leader*; NIKHILL
NIHALANI, *Psychiatrist*; ROBERT WOODS, *Superintendent*,

                              Defendants.

**APPEARANCES:**                      **OF COUNSEL:**

JOSEPH BLOOMFIELD
Plaintiff, *Pro Se*
110-51 155th Street
Jamaica, New York 11433

HON. ANDREW M. CUOMO              CHARLES J. QUACKENBUSH, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

    *Pro se* Plaintiff Joseph Bloomfield brings this civil rights action, pursuant to 42 U.S.C. § 1983, asserting Defendants violated his civil rights when they involuntarily confined him in a mental

---

[1] In the Caption and throughout the body of the Amended Complaint, Plaintiff spells this Defendant's name as "Wurzberger," however, in the "Parties" section of that pleading, he refers to this same individual as "Wursenberger. *See generally* Dkt. No. 10. Garnering its information from the Parties section, the Clerk has listed this Defendant on the Docket Report as "Wursenberger."  In correspondence to the Court and in their Motion, Defendants utilize the former spelling, which we presume to be correct. Dkt. No. 26 & 28. The Court will utilize the spelling as agreed upon by the parties, "Wurzberger," and will direct the Clerk to correct the spelling in the Docket Report.

institution upon the cessation of his state incarceration sentence. Dkt. No. 10, Am. Compl. Currently pending before this Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 28. Despite being granted multiple extensions of time, Plaintiff has failed to oppose the Motion. *See* Text Notice, dated Mar. 23, 2009; Dkt. No. 31, Order, dated May 14, 2009. For the reasons that follow, it is recommended that Defendants' Motion be **granted in part and denied in part**.

## I. BACKGROUND

### A. Procedural History

Plaintiff initiated this action, *pro se*, on June 12, 2008, with the filing of a civil rights Complaint; the sole Defendant named in that pleading was former-Governor George E. Pataki. Dkt. No. 1, Compl. In accordance with 28 U.S.C. § 1915A,[2] this Court performed an initial review of the Complaint and found it to be inadequate due to Bloomfield's failure to allege any personal involvement on behalf of former-Governor Pataki, thus, dismissal of the action was warranted. Dkt. No. 5. In a Report-Recommendation and Order, this Court recommended that in light of Plaintiff's *pro se* status, prior to dismissing the action outright, Bloomfield should be given an opportunity to amend his Complaint. *Id*. That recommendation was adopted by the Honorable Gary L. Sharpe, United States District Judge, and Plaintiff was given an opportunity to amend his pleading. Dkt. No. 9. Thereafter, on October 28, 2008, Plaintiff filed his Amended Complaint, dropping Pataki from the action and naming eight other Defendants in his stead. Dkt. No. 10, Am. Compl. After reviewing the amended pleading, this Court directed that Summonses be issued and, because of his *in forma pauperis* status, the Marshals were to effect service on Plaintiff's behalf. Dkt. No. 12.

---

[2] At that time, Plaintiff was incarcerated at the Wende Correctional Facility, and so, pursuant to 28 U.S.C. § 1915A, the Court was required to perform an initial review of his pleading to determine its sufficiency.

On February 27, 2009, after all Defendants had been served with process, Defendants filed a Motion to Dismiss in lieu of an answer. Dkt. No. 28. In accordance with this District's Local Rules of Practice, a response to that Motion was due by March 16, 2009. On March 4, 2009, the Court received a Notice from Plaintiff indicating a change in his address. Dkt. No. 29. In light of this updated address, the Court *sua sponte* rescheduled Plaintiff's response deadline to April 13, 2009, and Defendants re-served their Motion to Dismiss on Plaintiff at his new civilian address. Dkt. No. 30. By May 14, 2009, the Court still had not received a response from Plaintiff. Once again, we *sua sponte* reset Plaintiff's response deadline, this time to June 15, 2009. Dkt. No. 31. To date, the Court has not received any opposition from Plaintiff; in fact, Plaintiff has not communicated with the Court since March 4, 2009, when he filed his Notice of Change of Address.[3] Dkt. No. 29.

### B. Allegations in the Amended Complaint

In accordance with the standard of review utilized in assessing a motion to dismiss, the following facts asserted in the Amended Complaint are accepted as true. *See infra* Part II.A.

The events giving rise to this civil action occurred at Upstate Correctional Facility ("Upstate") and Central New York Psychiatric Center ("Central"). Am. Compl. at ¶ 2. At all times relevant to this case, Bloomfield was an inmate in the custody of the New York State Department of Correctional Services ("DOCS") and then an inpatient in the custody of the New York State

---

[3] By this Court's May 14, 2009 Order, Plaintiff was specifically warned of the consequences that could ensue should he fail to respond to Defendants' Motion, including dismissal of his action for the reasons stated by the Defendants and/or due to Plaintiff's failure to prosecute this matter. Dkt. No. 31. Given the amount of time that has passed without any communication from Plaintiff, the Court could recommend an exercise of its authority to dismiss this entire action based on Plaintiff's failure to prosecute this matter. *See* FED. R. CIV. P. 41(b); N.D.N.Y.L.R. 41.2(a). However, in light of his *pro se* status and the important constitutional issues raised herein, we will assess the viability of his pleading against Defendants' Motion, but without the benefit of Plaintiff's input. Should, however, Plaintiff continue this apathetic litigation approach, the Court's patience and leniency will surely expire and dismissal for failure to prosecute will be within the realm of probability.

Office of Mental Health ("OMH"). *Id*. at ¶ 3. According to the DOCS website, Bloomfield was, at the time period relevant in the Amended Complaint, serving an indeterminate sentence of incarceration for convictions of Sodomy in the First Degree and Attempted Robbery in the Second Degree. *See* NY DOCS Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny.us (information for Inmate Joseph Bloomfield, DIN 99-A-4562) (last visited Sept. 15, 2009).[4]

On July 28, 2006, less than a week before Plaintiff's scheduled release from Upstate, Bloomfield met with Defendants Bezalel Wurzberger, M.D., and Jose Gonzalez, M.D., via video conference. Am. Compl. at ¶ 14. Both of these Defendants were, at that time, psychiatrists employed by OMH and were assigned to conduct examinations at Upstate. *Id*. at ¶¶ 4-5. The meeting was brief, lasting for only a "few moments." *Id*. at ¶ 14. During the meeting, Bloomfield was advised that he fit the criteria for civil commitment under "Sex Offender Mental Hygien[e] Law ["MHL"] Section 9.27" and was to be involuntarily committed on August 3, 2006, the date on which he was set to be released from DOCS custody. *Id*. at ¶ 15. Also on July 28, 2006, the two doctors each completed a "Certificate of Examining Physician" justifying the involuntary commitment.[5] According to Plaintiff, Defendant Wurzberger's Certificate of Examining Physician states that it would be "prudent to admit [Bloomfield] to inpatient treatment in order to prevent harm to others, before his return to the community," while Defendant Gonzalez's Certificate of Examining Physician states that Bloomfield "is considered a danger to others based on his repeated sexual

---

[4] The Court takes judicial notice of the information contained on the DOCS website as such public information is "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED. R. EVID. 201(b)(2); *Marcus v. AT & T Corp.*, 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996) (noting that a court may take judicial notice of public documents ,even if not included in or attached to a complaint).

[5] Neither of these documents were attached to the Complaint nor Amended Complaint, though Plaintiff quotes from the documents in his Amended Complaint. Am. Compl. at ¶¶ 17-18.

offenses . . . indicating high likelihood to re-offend." *Id*. at ¶¶ 16-18.

On August 3, 2006, pursuant to MHL § 9.27, Defendant Robert Woods, Superintendent of Upstate, facilitated Bloomfield's transfer to Central. *Id*. at ¶ 19. Upon arrival at Central, Defendant Sara Nelson, M.D., a staff psychiatrist employed by OMH and assigned to Central, confirmed that Plaintiff was admitted to Central as an "involuntary-status" patient pursuant to MHL § 9.27. *Id*. at ¶¶ 6 & 21. Then, in accordance with a policy sanctioned by Defendant Donald Sawyer, Ph.D., Acting Executive Director of Central, Plaintiff was subjected to a "strip-frisk search" of his clothes and body cavities.[6] *Id*. at ¶¶ 7 & 20. During his stay at Central, Plaintiff was thrice more subjected to this type of search following visits from relatives on August 12, September 9, and October 15, 2006. *Id*. at ¶¶ 23-25.

While at Central, Plaintiff was also subjected to various threats. First, on August 3, 2006, Defendant Jeffrey Nowicki, Treatment Team Leader employed by OMH and assigned to Central, approached Plaintiff and stated, "I don't care if you stay here forever[,] I am team leader and I will do whatever it takes to keep people like you off the streets." *Id*. at ¶¶ 9 & 22. Then, on November 16, 2006, Defendant Nikhill Nihalani, a psychiatrist employed by OMH and assigned to Central, threatened to persuade Plaintiff's parole officer to violate him if he did not consent to a urine test. *Id*. at ¶¶ 10 & 26. Defendant Nihalani then ordered Bloomfield to submit a urine sample while in Nihalani's presence. *Id*. Also, Defendant Shakunthala Mudigonda, a social worker employed by OMH and assigned to Central, falsified statements in Bloomfield's "Core History" and "Treatment Plan." *Id*. at ¶¶ 8 & 27.

Thereafter, on September 28, 2006, Defendant Sawyer applied to the Supreme Court, Oneida

---

[6] Plaintiff does not identify who performed these strip-frisk searches.

County, for a "Court Authorization to Retain a Patient." *Id*. at ¶ 28.

## II. DISCUSSION

### A. Motion to Dismiss Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6 (1963); *see also Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, __ U.S. __, 129

S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id*. (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, __ U.S. __ 129 S.Ct. at 1950 (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __ 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims . . . across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, __ U.S. __ 129 S.Ct. at 1950-51.

With this standard in tow, we consider the plausibility of Plaintiff's Amended Complaint.

**B. Bloomfield's Claims**

In liberally construing the Amended Complaint, we conclude that Bloomfield attempts to raise the following claims against the following Defendants: 1) claims of threats and/or falsification of records against Defendants Nowicki, Nihalani, and Mudigonda; and 2) Due Process violations, stemming from his involuntary commitment to Central pursuant to Article 9 of the Mental Hygiene Law, against Defendants Wurzberger, Gonzalez, Wood, Nelson, and Sawyer. Am. Compl. at ¶¶ 29-36.[7]

*1. Threats and Falsification of Records*

Bloomfield asserts that during his stay at Central, Defendants Nowicki and Nihalani threatened him, with the latter compelling him to submit to a urine test, and Defendant Mudigonda falsified records. Am. Compl. at ¶¶ 22, 26, & 27. Assuming the veracity of these facts, none of these claims rise to the level of a constitutional violation.

A claim brought under § 1983 is "not designed to rectify harassment or verbal abuse." *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (citing *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996)); *Aziz Zarif Shabazz v. Picco*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (noting that, ordinarily, a claim for verbal harassment is not actionable under § 1983). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz*, 994 F. Supp. at 474 (cited in *Garrett v. Reynolds*, 2003 WL 22299359, at * 4 (N.D.N.Y. Oct. 7, 2003) & *Moncrieffe v. Witbeck*, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000)). Therefore, Plaintiff has

---

[7] Bloomfield seeks compensatory damages for pain and mental anguish he suffered in an amount no less than $300,000. No injunctive relief is sought.

failed to state a claim for relief against Defendants Nowicki and Nihalani as their purported threats do not rise to the level of a constitutional violation.

As for the falsification of records claim, it is unclear in what manner these records were falsified and how such falsity harmed Plaintiff. The filing of a false entry in medical records, without more, does not constitute a constitutional violation. *Benitez v. Locastro*, 2008 WL 4767439, at *11 (N.D.N.Y. Oct. 29, 2008) (allegation that defendants falsified plaintiff's medical records did not state a valid § 1983 claim); *Diaz v. Goord*, 2006 U.S. Dist. LEXIS 14309, at *20 (W.D.N.Y. Mar. 20, 2006) (allegation of false medical entries did not state a valid claim). Thus, Plaintiff's sole claim against Defendant Mudigonda for falsifying his records at Central also does not rise to the level of a constitutional violation.

Accordingly, Plaintiff's Amended Complaint fails to state a plausible cause of action against Defendants Nowicki, Nihalani, and Mudigonda, and the Defendants' Motion to Dismiss should be **granted** as to these Defendants.

### 2. Due Process

Next, we address Plaintiff's claims of violations of his due process in connection with his involuntary admission into psychiatric treatment at Central. To put this issue into perspective, some background information is necessary with regard to New York's Mental Hygiene Law.

Article 9 of the New York Mental Hygiene Law provides for the involuntary psychiatric commitment of "any person alleged to be mentally ill and in need of involuntary care and treatment." N.Y. MENTAL HYG. LAW § 9.27. Such admission may only be accomplished "upon the certificates of two examining physicians, accompanied by an application for the admission of such person." *Id*. at § 9.27(a). The application for admission must be made by someone with personal

knowledge of the individual, and shall "contain a statement of the facts upon which the allegation of mental illness and need for care and treatment are based." *Id*. at § 9.27(b) & (c). Upon arrival to the facility, a doctor must complete a confirmatory examination of the patient prior to his or her admission. *Id*. at § 9.27(e). Then, after hospitalization, the patient may request a judicial hearing to address the need for hospitalization. *Id*. at § 9.31.

Upon information and belief, in the Fall of 2005, "professionals from the [New York State] Office of Mental Health (OMH) began to evaluate certain felony sex offenders nearing the completion of state prison sentences to assess whether they posed a danger to themselves or others and suffered from mental conditions that warranted commitment in a psychiatric hospital." *State ex. rel. Harkavy v. Consilvio*, 870 N.E.2d 128, 129 (N.Y. 2007) (*Harkavy II*). Such evaluations were accomplished via Article 9. At that time, there was no specific state statutory authority governing the release of felony offenders from prison into psychiatric hospitals upon completion of their prison sentences. At issue in the *Harkavy* case was whether the individuals to be committed were "prisoners" and thus entitled to the procedures set forth in Correction Law § 402, which governs the involuntary admission of mentally ill inmates *during* their prison sentence, instead of Article 9. *State ex. rel. Harkavy v. Consilvio*, 859 N.E.2d 508 (N.Y. 2006) (*Harkavy I*). Notably, Correction Law § 402 calls for pre-commitment notice and hearing, while Article 9 does not. The New York State Court of Appeals noted that neither Article 9 nor § 402 were specifically designed to address the class of mentally ill patients set to be released into the community, but "in the absence of a clear legislative directive in regard to inmates nearing their release from incarceration," and in light of the fact that the evaluations were completed during the prison sentence, in non-emergency situations, § 402 was the more appropriate mechanism for evaluating an inmate for "postrelease involuntary

commitment to a mental facility." *Id*. at 512.  The court further noted, however, that "[o]nce the sentence expire[d], . . . any further proceedings concerning the continued need for hospitalization are governed by the Mental Hygiene Law."  *Id*.

Following the 2006 *Harkavy I* decision, the state legislature bridged the gap in the law by "enacting a legislative scheme designed to address the civil confinement of certain classes of inmates completing their terms of imprisonment."  *Harkavy II*, 870 N.E.2d at 131.  This act, entitled the "Sex Offender Management and Treatment Act," created Article 10 of the Mental Hygiene Law, which provides the procedures to be followed for the transfer of certain convicted offenders to psychiatric hospitals after release from prison.  *Id*.

As set forth in the Amended Complaint, Bloomfield's involuntary commitment to a psychiatric hospital was accomplished in August 2006, prior to the New York State Court of Appeals' decision in *Harkavy I* and the 2007 legislative enactment of Article 10.  This backdrop of information is relevant because the Defendants' Motion to Dismiss is primarily based upon the later enactment of Article 10, which they assert provides Plaintiff's exclusive remedy.  They further assert that just as the New York State Court of Appeals ruled in *Harkavy II*, Bloomfield's "complaints against the 2006 procedures under which he was retained . . . have been rendered academic by the 2007 enactment of Article 10."  Dkt. No. 28-2, Defs.' Mem. of Law, at p. 4.  In the alternative, Defendants assert they are entitled to qualified immunity for following the only statutory scheme in place at that time for such involuntary commitments.  At this stage of the litigation, we disagree on both fronts.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz*, 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier*. *See Pearson v. Callahan*, __ U.S. __ 129 S.Ct. 808 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id*. at 818.

Qualified immunity is an affirmative defense that must be pled by the official claiming it. *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (citing *Harlow v. Fitzgerald*, 457 U.S. at 815). The only pleadings filed in the present case thus far are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading, as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of the Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a . . . 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983); *see also McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (quoting *Green*). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall*, 22 F. Supp. 2d 156, 162 (S.D.N.Y. 1998) (citing *Green v. Maraio*, 722 F.2d at 1019); *see also McKenna v. Wright*, 386 F.3d at 435.

By alerting the Court to the state court decisions in *Harkavy* and the subsequent legislative enactment of Article 10, it appears that Defendants may have inadvertently conceded that Bloomfield did not receive the full panoply of due process protections prior to his involuntary admission. Nevertheless, they argue that they are entitled to qualified immunity because they "provided [Bloomfield] with process which was due under the then-existent state of the law." Defs.' Mem. of Law at p. 6. But this argument is neither an accurate description of the status of the law at the time of Plaintiff's involuntary admission, nor of Plaintiff's claims themselves.

First we address Defendants' rendition of the protections due under the law in place at the time in question. Defendants seem to suggest that, at the time of Bloomfield's involuntary admission, the only statutory scheme in place was Article 9, therefore, they are immune from suit having relied on a presumptively valid statute. However, the Defendants overlook the fact that Corrections Law § 402 was also in place at the time in question, yet they opted to not follow that equally presumptively valid statute. Just because Article 10 was later enacted to cover a perceived gap in New York State law does not mean that Plaintiff had no entitlement to due process. Whether Defendants are entitled to qualified immunity for relying on one law over another depends, in our view, on whether the rights Plaintiff asserts he was entitled to were clearly established as of his involuntary admission. We find that they were. Indeed, as early as 1980, the Supreme Court ruled that the involuntary transfer of a prisoner to a mental hospital implicates a liberty interest protected by the Fourteenth Amendment's Due Process Clause. *Vitek v. Jones*, 445 U.S. 480 (1980).[8] In so

---

[8] In *Vitek*, the Court also engaged in an analysis of the challenged Nebraska state statute to determine if a liberty interest was created therein. This analysis obviously pre-dates the Court's decision in *Sandin v. Conner*, 515 U.S. 472, 484 (1995), which called into question the continued validity of the process described in *Hewitt v. Helms*, 459 U.S. 460 (1983), wherein courts were directed to scrutinize state statutes for mandatory language in determining whether the state created a liberty interest, which, without due process, could not be denied. Because the Supreme Court in *Vitek* found
(continued...)

holding, the Court emphasized that certain procedural protections *must* be provided *before* the transfer of a prisoner to a mental hospital. *Id*. at 493 (noting that, just as with private citizens, a convicted felon "is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital"). Heavily swaying the Court's decision was the fact that not only are these individuals stigmatized by virtue of being labeled mentally ill, but their involuntary psychiatric commitment further subjected the individuals to "mandatory behavior modification as a treatment for mental illness." *Id*. at 494. Among the procedures sanctioned as those that should precede such commitment include:

> A. Written notice to the prisoner that a transfer to a mental hospital is being considered;
> B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;
> C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;
> D. An independent decisionmaker;
> E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;
> F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own;[9] and
> G. Effective and timely notice of all the foregoing rights.

*Id*. at 494-95 (internal quotation marks and citations omitted).

New York State Corrections Law appears to satisfy the clearly established procedures set forth in

---

[8](...continued)
that a prisoner's liberty interest in remaining free from involuntary commitment to a psychiatric hospital also arises under the Due Process Clause of the Fourteenth Amendment, we need not address the pre-*Sandin* analysis of the Nebraska state statute, nor do we need to engage in an analysis of whether New York similarly created a liberty interest.

[9] Only three other Justices joined this aspect of the opinion, that is, whether due process requires appointment of counsel for indigent prisoners thought to be suffering from a mental disease or defect. *Vitek v. Jones*, 445 U.S. at 496.

*Vitek*, while Article 9 does not. In this regard, we find that at this stage, Defendants' reliance on Article 9 as the only protections available to be misplaced. At the very least, it is questionable at this stage whether their reliance on Article 9 as the sole avenue was reasonable.

Next we address Defendants' possible misreading of Plaintiff's claims. In liberally construing Plaintiff's Amended Complaint, it appears to this Court that his due process complaints are two-fold. On the one hand, he seemingly takes umbrage with the constitutionality, or rather, inadequate due process protections, of Article 9 itself, while, at the same time, he appears to state that he was not even afforded the minimal protections set forth in Article 9. For example, Bloomfield states that he met with the two doctors via video conference for a single examination that lasted only a few moments. While the categorization of the exact length of time could be viewed as conclusory, it is clear that Bloomfield is asserting, as fact, that a short, brief meeting ensued wherein he was determined to be mentally ill. It is difficult to assess at this juncture whether a full picture of Bloomfield's mental state could be developed in such a short "examination," of which neither doctor was in Bloomfield's physical presence. Other alleged violations of Article 9 include the way in which the certifications of mental infirmity were drafted. As the content of the examination and certifications are not fully developed, we are not in a position to adduce whether full compliance with Article 9, or other due process protections, was adhered to in this case. For example, MHL § 9.27(c) mandates that the application for admission must contain a "statement of the facts upon which the allegation of mental illness and need for care and treatment are based," yet, it is not clear whether this process was adhered to. N.Y. MENT. HYG. LAW 9.27(c). Also, the examining physicians are directed to consider, prior to completing a certificate of examination, alternate forms of treatment. *Id.* at § 9.27(d). We must accept for purposes of this Motion that the

procedures set forth in Article 9 were not fully followed.

We find that Plaintiff has adequately pled that his involuntary commitment is both inconsistent with the procedures set forth in Article 9 and with the well-established Supreme Court decision in *Vitek*, in that, for example, there was no requirement for pre-commitment notice to the patient, no mandate that a court-appointed independent physician conduct a psychiatric examination, nor was he afforded the possibility for a pre-commitment judicial hearing. It is also not clear what post-confinement process was provided to Bloomfield. In this regard, we cannot find, at this stage of the litigation, that the process afforded to Plaintiff was constitutionally adequate, nor can we find under the facts alleged that any reasonable person would plausibly believe that the cursory evaluation Plaintiff alleges he received was adequate to provide him with a meaningful assessment of his mental health.

For all of the above reasons, we find that the qualified immunity defense is not readily apparent at this stage. *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002) (noting that a determination of qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings"); *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004) ("Resolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation."). Further debilitating to the imposition of qualified immunity at this juncture is the fact that, on the record before us, "even a lower ranking subordinate could not have reasonably believed that the perfunctory procedures here provided (as alleged by plaintiff[]) remotely comported with elementary fairness and due process." *Bailey v. Pataki*, __ F. Supp. 2d __, 2009 WL 2001178, at *4 (S.D.N.Y. July 10, 2009).

Lastly, Defendants urge the Court to dismiss this action because it is now governed by the

procedures set forth in Article 10. In support of this argument, Defendants cite to the *Harkavy II* decision wherein the patients' challenge to their continued confinement against their will in a psychiatric hospital was rendered "academic" by virtue of the Article 10 procedure, which then encompassed those patients. First, it is unclear whether Bloomfield ever received the Article 10 procedures, though given the timing of his involuntary commitment, he was probably entitled to such process. Second, and most importantly, the patients at issue in the *Harkavy* decisions proceeded under *habeas* petitions. Thus, it is clear why their *habeas* challenge to their continued confinement in a psychiatric hospital pursuant to Article 9 would be rendered academic by the enactment and application of Article 10. Indeed, at the time of *Harkavy II*, each of those patients was being provided the additional procedural protections of Article 10. The proceeding before us, however, is not one for immediate release; instead, Bloomfield seeks monetary damages for alleged constitutional violations. Such relief is neither available in *habeas* proceedings nor in an Article 10 proceeding. Thus, nothing about whether Bloomfield later received due process under Article 10 precludes his ability to seek monetary damages for violations of his due process rights in accordance with his Article 9 involuntary admission. *See Bailey v. Pataki*, __ F. Supp. 2d __, 2009 WL 2001178, at *6 (noting that despite the fact that the plaintiffs were receiving Article 10 proceedings, their due process claims stemming from their Article 9 involuntary admission are not barred by the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), since the Article 10 proceedings do not afford an "adequate opportunity for judicial review of their federal constitutional claims arising out of their commitment pursuant to Article 9").

At this early stage of the litigation, Plaintiff has alleged enough facts to survive a Motion to Dismiss by stating that his due process rights were violated during his Article 9 involuntary

commitment to a psychiatric hospital. By this decision, we do not foreclose Defendants' ability to present the affirmative defense of qualified immunity to the Court at a later time when the factual record is more fully developed.

### III. CONCLUSION

For the reasons stated herein, it is

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 28) be **granted in part and denied in part** consistent with this opinion; and it is further

**RECOMMENDED**, that Defendants Shakunthala Mudigonda, Jeffrey Nowicki, and Nikhill Nihalani be **dismissed** from this action for the reasons stated above; and it is further

**ORDERED**, that the Clerk of the Court correct the Docket Report to reflect the correct spelling of Defendant Wurzberger's name; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   September 18, 2009
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge